IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-00156-RBJ

LAWRENCE RITCHIE,

    Plaintiff,

v.

THE GEO GROUP, INC.,

    Defendant.

---

**SECOND AMENDED COMPLAINT & JURY DEMAND**

---

Plaintiff Lawrence Ritchie, by and through undersigned counsel, Olivia Kohrs and Danielle C. Jefferis of Novo Legal Group, LLC, hereby alleges for his Second Amended Complaint and Jury Demand as follows:

## I. INTRODUCTION

1. In 2018, Lawrence Ritchie was incarcerated in the custody of the United States Marshals Service ("USMS"), and confined at the Aurora Detention Facility ("ADF"), a detention center operated and managed by Defendant The GEO Group, Inc. ("GEO"). Defendant GEO is a for-profit company managing private prisons across the country pursuant to contracts with the federal government and local and state entities.

2. On January 17, 2018, Mr. Ritchie was jumped and attacked by a group of USMS detainees in his unit. What began as a one-on-one verbal dispute escalated into a full-fledged assault of Mr. Ritchie, who was outnumbered and violently beaten by at least five other men. This

assault spanned three separate locations in the facility, but at no point did GEO staff intervene to de-escalate the situation. As Mr. Ritchie drifted in and out of consciousness during the attack, GEO employees simply watched from their desk on the other end of the unit. When Mr. Ritchie regained consciousness, he found that no one was around him anymore. Two of his fellow prisoners came to see if he was okay but no GEO employee had intervened in the assault or otherwise come to his aid.

3.      After Mr. Ritchie laid on the floor unattended for several agonizing minutes, GEO employees finally helped him to his feet and walked him over to sit at a table in the unit. After sitting there for another few minutes, GEO employees finally assisted Mr. Ritchie out of the unit.

4.      After the assault, Defendant GEO called the Aurora Police Department ("APD"). When the responding APD officer inquired about beginning an investigation, GEO assured the APD that GEO would handle any investigation internally. Defendant GEO instructed the APD not to speak with Mr. Ritchie, and APD complied with no further discussion.

5.      After the assault, Mr. Ritchie spent three hours in a holding cell, in extreme pain, vomiting, and losing consciousness before he finally got the attention of a nurse who called an ambulance to take him to the emergency room. There, UC Health doctors determined that Mr. Ritchie had a concussion and a torn eyelid that required stitches. Upon information and belief, Mr. Ritchie also suffered broken ribs and a broken nose, and many bruises and contusions.

6.      For the next three months, Mr. Ritchie languished alone in his segregation cell back at the ADF. He was in near-constant physical and psychological pain as he tried to heal from his assault. He believed his ribs were healing incorrectly because of the pain he felt, and he felt depressed, angry, and isolated as he tried to process what had happened to him. Mr. Ritchie was

left solely to his own devices to heal both his physical and psychological trauma. At times, Defendant GEO placed some of the men who assaulted Mr. Ritchie in the segregation unit with him, thereby putting him at substantial risk of being re-victimized. Still, no APD officer came to speak with Mr. Ritchie, and upon information and belief GEO took no further steps to investigate the assault.

7. Mr. Ritchie suffered serious physical, mental, and emotional injuries as a result of this assault, which was a result of Defendant GEO's failure to protect him. Defendant GEO violated its duty of care to Mr. Ritchie by failing to enact policies and procedures, or take action, to minimize the risk of or otherwise prevent the assault, to intervene in the assault on Mr. Ritchie, or take reasonable steps necessary to mitigate the violence and impact of the assault.

8. To date, Mr. Ritchie continues to suffer the harmful effects of these injuries.

## II. JURISDICTION AND VENUE

9. This Court has subject matter and personal jurisdiction over this action pursuant to 28 U.S.C. § 1332.

10. Mr. Ritchie brings his claim pursuant to the state law of Colorado, and jurisdiction for that claim is conferred pursuant to 28 U.S.C. § 1332. At all times relevant to the subject matter of this jurisdiction, Mr. Ritchie was a resident of and domiciled in the State of Colorado, and Defendant GEO was a corporation incorporated in the State of Florida. The amount in controversy exceeds $75,000.

11. There are no available administrative remedies to exhaust pursuant to C.R.S. 13-17.5-102-3. There are no other administrative exhaustion requirements that would pose as a bar to the claim in this case.

12. Venue is proper in this District under 28 U.S.C. § 1391(b). A substantial part of the events and omissions giving rise to the claims asserted in this action occurred within the District of Colorado.

### III. PARTIES

**Plaintiff**

13. At all times relevant to the subject matter of this litigation, Plaintiff Lawrence Ritchie was a citizen of the United States of America, and a resident of and domiciled in the State of Colorado. He is currently incarcerated in the custody of the Federal Bureau of Prisons at the United States Penitentiary, Beaumont, at 6200 Knauth Rd., Beaumont, Texas, 77705.

**Defendant**

14. Defendant GEO is a corporation incorporated in the State of Florida, with its corporate headquarters at 4955 Technology Way, Boca Raton, Florida 33431. GEO's registered agent of service in Colorado is Corporate Creations Network, Inc., located at 155 East Boardwalk #490, Fort Collins, Colorado 80525.

15. Under a contract with the federal government, GEO operates and manages the Aurora Detention Facility at 3130 North Oakland Street, Aurora, Colorado 80010. Defendant GEO is, and has been at all times relevant to the subject matter of this Complaint, a corporation registered to do business under the laws of the State of Colorado.

16. In addition to direct liability for its own actions and omissions, Defendant GEO is vicariously liable for the acts, omissions, and wrongful conduct of its staff, agents, and employees committed within the scope of their employment.

## IV. STATEMENT OF FACTS

*Background*

17. Mr. Ritchie arrived at the Aurora Detention Facility in late 2017, in the custody of the USMS.

18. At all times relevant to the subject matter of this Complaint, Defendant GEO contracted with the federal government to own and operate the ADF, a detention center housing people in the custody of the USMS, in addition to people in U.S. Customs and Immigration Enforcement custody.

19. When he arrived at the ADF, Defendant GEO assigned Mr. Ritchie to a housing unit with many other USMS detainees. The unit housed mostly Hispanic men at the time, with around five white men and ten to fifteen Black men. In the weeks leading up to his assault, Mr. Ritchie witnessed a couple fights in the unit between Hispanic men and Defendant GEO staff doing very little to nothing to prevent or stop these confrontations. It did not seem to Mr. Ritchie that Defendant GEO had procedures in place to do as much as possible to protect the detainees from fights and serious assaults.

20. Once he arrived at the ADF, GEO staff conducted an intake of Mr. Ritchie, who reported that he had been diagnosed with anxiety, depression, and bipolar disorder. GEO diagnosed him with "bipolar disorder, type 1, MRE depressed" on December 7, 2017.

21. Upon information and belief, he was transferred to the ADF from a different jail because he had been having trouble accessing proper medication and mental health treatment at his previous facility.

22. Mr. Ritchie knew, from years of trying different medications to treat his mental health needs, what combination worked best for him. When left untreated, those needs caused Mr. Ritchie to act impulsively and, at times, violently. Unfortunately, upon information and belief, he was taken off those medications when he was taken into federal custody.

23. Upon information and belief, Mr. Ritchie was transferred to the ADF from a county jail because he had been having trouble accessing proper medication and mental health treatment at his previous facility.

24. Although, upon information and belief, he was transferred to ADF to address his inability to access the proper medications at his previous facility, Mr. Ritchie remained unable to obtain those medications at GEO, despite his requests. Defendant GEO staff instead prescribed him different medications that were ineffective.

25. On December 12, 2017, Mr. Ritchie reported to GEO that he was not doing well off of his regular medications, and that he was worried that he would do something impulsive or act violently if pushed, stating that he had acted impulsively and violently in the past when he was off his medications.

26. He continued to report concerns to Defendant GEO staff about his mental health, including that he was having panic attacks, insomnia, and nightmares. Unfortunately, GEO staff did not take Mr. Ritchie's self-reports of fear of impulsive or violent behavior seriously, and about a month later, he was involved in an altercation that escalated into a serious assault due to Defendant GEO's negligence in protecting him.

*The Assault*

27. On January 17, 2018, just a few weeks after arriving in the unit, Mr. Ritchie got into an argument with another USMS detainee over a handball game. Upon information and belief, the verbal argument escalated, and the other USMS detainee (a Hispanic man) started calling Mr. Ritchie names.

28. It is well-known and accepted in prison culture and prison politics that if a person is verbally threatened or insulted, like by name-calling, and they do not respond to that threat or insult, they are putting themselves at risk of being perceived as weak, and thus targeted for physical attack or exploitation. It does not take long for someone who has spent time in prison, like Mr. Ritchie, to learn the necessity of responding to those kinds of threats or insults if they do not want to be perceived or labeled "weak."

29. Prison politics often fall largely along group identity lines, and these identities and groups, which often serve as a source of safety or protection, are very frequently drawn along racial lines. Because Mr. Ritchie was white and was largely outnumbered at that time in his unit, he did not have as large of a group with which to associate or from which to draw safety, so avoiding the risk associated with being labeled "weak" was all the more critical in this situation for Mr. Ritchie's own safety.

30. To protect himself from becoming a target by not responding to the name-calling, Mr. Ritchie punched the other detainee to demonstrate that he was not to be perceived as "weak" and thus targeted.

31. Upon information and belief, GEO staff did nothing to de-escalate this argument or to intervene.

32. Instead, the fight continued to escalate, and Mr. Ritchie and the other detainee returned to the unit and took their argument to a cell inside the unit. Upon information and belief, there was a second fight in the cell that lasted about three minutes. During that time, many detainees began gathering around the cell, but again, GEO staff did nothing to break up the large gathering in the corner or otherwise intervene in the obvious disturbance in the unit.

33. When Mr. Ritchie left the cell, bleeding, a group of Hispanic men were already gathered outside of the door to the cell waiting for him. Mr. Ritchie and one of the other detainees were shouting at each other, which drew the attention of the rest of the men in the unit.

34. Soon, more and more detainees, all Hispanic men, gathered around Mr. Ritchie. They began circling him, as though they were preparing to attack him.

35. While this was happening, GEO employees were talking to each other near their desk and ignoring what was happening in plain view in the unit.

36. Suddenly, the argument escalated into an assault, as at least five USMS detainees, all Hispanic men, joined in to outnumber and beat Mr. Ritchie to the ground. In full view of at least one Defendant GEO employee—who still remained at his desk on the other side of the unit—Mr. Ritchie went in and out of consciousness two or three times as the group of men continued to brutally kick and punch him.

37. No Defendant GEO employee intervened to de-escalate the argument between Mr. Ritchie and the other man before it turned violent, and no Defendant GEO employee intervened to stop the fights that spanned three separate locations in the facility, all despite the fact that several fights had taken place in the unit in the weeks leading up to this assault, Defendant GEO employees knew that fights often take place in the unit between detainees, and Mr. Ritchie and the other

detainee had drawn the attention of other detainees in the unit while they argued and fought inside the cell.

38. Because he was fading in and out of consciousness, Mr. Ritchie had no idea how long the group beating continued but it felt like it lasted forever.

39. While Mr. Ritchie was being beaten, Defendant GEO employee Devios looked on from his desk but did nothing to interfere to stop the assault.

40. When Mr. Ritchie finally regained consciousness once again, he realized the men who had attacked him were no longer beating him up; they had scattered back into the housing unit. Mr. Ritchie was the only person who sustained injuries. Still no Defendant GEO employee had come to his aid.

41. After Mr. Ritchie laid on the floor unattended for several agonizing minutes, GEO employees finally helped him to his feet and walked him over to sit at a table in the unit. After sitting there for another few minutes, GEO employees finally assisted Mr. Ritchie out of the unit.

42. After a cursory examination, Defendant GEO medical staff placed Mr. Ritchie in a holding cell by himself in the medical unit. Upon information and belief, they gave him nothing to treat his injuries.

43. Mr. Ritchie was bleeding profusely. He continued to lose and regain consciousness and vomit while he yelled and yelled for someone to help him; he knew something was seriously wrong.

44. Someone finally listened—three hours later. A Defendant GEO nurse came to heed his cries for help. Recognizing the need for medical care, the nurse called an ambulance, three hours after the assault.

45. According to the 911 call, the nurse who made the call told the dispatcher that she was reporting a life-threatening emergency, and that "the gentleman got beat up really bad. He has a head injury."

46. Mr. Ritchie was taken by ambulance to the UC Health hospital where he was evaluated. The doctors told him that he had a concussion and a lacerated eyelid that required stitches. Upon information and belief, he also had a broken nose, broken ribs, and numerous bruises and contusions. Mr. Ritchie stayed in the hospital for four to six hours before being taken back to the ADF.

*The Police Report*

47. The USMS has a policy that criminal allegations that arise in detention centers should be referred to the appropriate criminal justice agency.

48. After the assault, Defendant GEO contacted the APD, the criminal justice agency that serves the community where ADF is located. GEO's call to the APD, however, was ultimately just for show. GEO contacted APD to get a report number and comply with policy, but not to allow the criminal justice agency to investigate the criminal allegations.

49. According to the police report filed by the APD officer who responded, Defendant GEO instructed the APD not to speak with Mr. Ritchie.

50. Rather than make her own assessment, as a law enforcement officer, as to whether or not she would speak with Mr. Ritchie or otherwise investigate this assault, the APD officer made the decision to defer to Defendant GEO—a for-profit, non-law-enforcement entity with personal stake in keeping allegations such as Mr. Ritchie's out of the public eye. Based on

Defendant GEO's persuasion, the officer made the affirmative choice not to speak with Mr. Ritchie or otherwise investigate the allegations of serious criminal assault he had suffered.

51. In the body cam footage of the APD officer who responded, the officer inquired about surveillance video of the assault, asking, "And you just saw them like stomping on [Mr. Ritchie] in the video?" To which a Defendant GEO employee responded, "You could see a lot of them. They were just, people were just running up into him and stomping on [Mr. Ritchie]."

52. That same body cam footage shows the APD officer saying to a GEO employee, "So then I won't talk to him. Um, I will make a report . . . uh, and in my report, I'll say that you guys want to handle it in-house unless you need our assistance in the future." To which the GEO employee responded, "Ok."

53. The APD officer and GEO employee discussed Mr. Ritchie's status as a USMS detainee, potentially facing prison time, to assume, without ever asking Mr. Ritchie, that he probably would not want to press any charges:

> **GEO employee:** "If he decides to press charges and he wants to call the local police in the area. Then we will do that."
>
> **Officer:** "So wait for now."
>
> **GEO employee:** "But, uh, these guys, ya, these guys are all pending, the Marshal guys are all pending going to prison."
>
> **Officer:** "Ok, so they're probably not worried about any of this."
>
> **GEO employee:** "Ya."

11

### *The Aftermath of Mr. Ritchie's Assault*

54.     When Mr. Ritchie was brought back to the ADF, he stayed in the medical unit for a few more days before Defendant GEO employees moved Mr. Ritchie into the segregation unit.

55.     In segregation, Mr. Ritchie was confined alone in a tiny cell for about three months following the assault.

56.     Defendant GEO also sent some of the people who had jumped Mr. Ritchie to segregation. Mr. Ritchie could hear these men yelling at him and taunting him while he was still suffering from the injuries they had inflicted on him.

57.     Upon information and belief, the segregation unit is also known as the Restrictive Housing Unit ("RHU"). In the RHU, although people spend the majority of their time confined, alone in their cells, there are still times during the day when people are moved through the unit for various reasons—going to their jobs within the facility, taking showers, or visiting the legal library, for example. During this time, detainees can pass in front of each other's doors, or even be out of their cells at the same time.

58.     Immediately after effectively communicating to the individuals who assaulted Mr. Ritchie that there would not be legal consequences for their actions, Defendant GEO placed them in the same unit with Mr. Ritchie. This impunity increased the risk that Mr. Ritchie would be the target of another attack.

59.     Mr. Ritchie suffered intense, sustained pain and believed his broken ribs might be healing incorrectly.

60.     Mr. Ritchie also tried to get adequate mental health care from Defendant GEO, including the psychiatric medication that he had been on for years, but Defendant GEO had stopped

giving him the medication when he arrived at the facility and continued to deny him his medication or any other form of effective mental health treatment even after the assault.

61. This made it even harder for Mr. Ritchie to process his assault, as he languished in segregation.

62. Mr. Ritchie is currently on medication for post-traumatic stress disorder, has nightmares, and is on medication for depression.

63. This assault, and the injuries that Mr. Ritchie sustained, continue to impact Mr. Ritchie's life in prison today. He is frustrated and not doing well. He is always on high alert, and he never feels safe. He does not understand why the people that hurt him could get away with what they did, and why no one seemed to care.

*A Culture of Impunity*

64. Mr. Ritchie's case is not unique. He was neither the first, nor the last person who was assaulted in ADF and then denied the opportunity to press charges against his attackers.

65. Defendant GEO—a private, for-profit, non-law-enforcement corporation with a stake in keeping allegations of injury inside its walls out of the public eye—has repeatedly told law enforcement, like it did in Mr. Ritchie's case, that it will handle criminal investigations "in house."

66. Defendant GEO's culture of secrecy created and has further fostered an environment where assaulters act with impunity.

67. This interdependent relationship and implicit agreement between Defendant GEO and APD that Defendant GEO would handle investigations "in-house" allowed Defendant GEO to dictate when and how an assault or other criminal allegation would or would not be investigated

within the walls of the ADF, regardless of how a similar allegation would be handled outside of its walls.

68. For example, in May 2017, a former ICE detainee was violently assaulted by two USMS detainees while housed in the RHU (upon information and belief, the same unit Mr. Ritchie would be housed in just seven or eight months later, with his attackers, following his assault). Like Mr. Ritchie months later, GEO never gave that man the opportunity to press charges against his attackers.

69. 911 calls out of the facility further demonstrate this pattern. In 911 call after 911 call, Defendant GEO told Aurora Dispatch that they didn't want anyone to come out to investigate—they just needed an incident number, thus maintaining the illusion of external accountability.

70. The ability of Defendant GEO to dictate the terms of APD investigations of criminal allegations allowed Defendant GEO to maintain its secrecy, preserve its public image, and altogether avoid transparency or accountability.

71. Defendant GEO maintained this system, effectively communicating to those inside the walls of ADF that their actions would go uninvestigated by law enforcement, unobserved by the public eye, and subject to the investigatory whims of non-law-enforcement GEO staff.

72. These actions created a dangerous environment for two specifically definable groups, of which Mr. Ritchie is a part: (1) incarcerated persons, who depend on his or her jailers to provide basic human needs, including protection from harm, and (2) victims of violent prison assaults, who as a result of the assaults are more vulnerable and at increased risk that they will be targeted again.

73. An incarcerated victim of a crime, however, is no less the victim of a crime simply because he may be facing a prolonged period of time in prison.

74. When crime victims, such as Mr. Ritchie, are denied the opportunity to even speak with a law enforcement agent, let alone make or be informed of any decisions regarding the crime they are a victim of, the effectiveness and well-being of the criminal justice system is challenged. The public is denied the opportunity to observe and, if necessary, hold accountable, private, for-profit companies like Defendant GEO when they choose to protect their public image over the people that they detain.

## V.  STATEMENT OF CLAIM FOR RELIEF

**CLAIM FOR RELIEF**
**Negligence – Assault**
**Against Defendant GEO**

75. Mr. Ritchie hereby incorporates all of the paragraphs of this Complaint as though fully set forth herein.

76. At all times relevant to the subject matter of this Complaint, Mr. Ritchie was a detainee confined to and in Defendant GEO's care. Defendant GEO owed Mr. Ritchie a duty to protect him from harm.

77. Because Mr. Ritchie was dependent on and under the control of Defendant GEO and its staff, employees, and agent, Mr. Ritchie had a special relationship with Defendant GEO, such that Defendant GEO had a duty to exercise reasonable care in protecting Mr. Ritchie's health and safety.

78. Defendant GEO grossly breached that duty when it failed to, *inter alia*, enact policies and procedures, or take action, to minimize the risk of or otherwise prevent the assault, to

intervene in the assault on Mr. Ritchie, or take reasonable steps necessary to mitigate the violence and impact of the assault.

79. Mr. Ritchie suffered—and continues to suffer—serious injuries as a result of Defendant GEO's breach of its date of care owed to Mr. Ritchie.

80. Defendant GEO's breach of its duty of care owed to Mr. Ritchie is the proximate cause of the injuries he suffered and continues to suffer.

81. Defendant GEO is vicariously liable for the acts and omissions of its staff, employees, and agents conducted within the scope of their employment.

## VI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff Lawrence Ritchie requests respectfully that this Court enter judgment in his favor and against Defendants, and award him all relief as allowed by law and equity, including, but not limited to the following:

  a. Compensatory damages, including but not limited to those for emotional distress and pain and suffering;

  b. Actual economic damages and consequential damages arising out of Defendants' conduct;

  c. Pre-judgment and post-judgment interest at the highest lawful rate;

  d. Attorneys fees and costs; and

  e. Such further relief as justice requires.

**Plaintiff requests a trial to a jury on all issues so triable.**

DATED this 6th day of July, 2020.

Respectfully submitted,

*s/ Olivia Kohrs*
Olivia Kohrs
Novo Legal Group, LLC
4280 Morrison Rd.
Denver, CO 80219
T: 303-335-0250
F: 303-296-4586
E: olivia@novo-legal.com

*s/ Danielle C. Jefferis*
Danielle C. Jefferis, *Of Counsel*
Novo Legal Group, LLC
4280 Morrison Rd.
Denver, CO 80219
T: 303-335-0250
F: 303-296-4586
E: danielle@novo-legal.com

## CERTIFICATE OF SERVICE

   I hereby certify that on July 6, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send electronic notification to the following recipients:

  Gordon Vaughan
  gvaughan@vaughandemuro.com

*Counsel for Defendant GEO Group, Inc.*

               <u>*s/ Olivia Kohrs*</u>
               Olivia Kohrs